UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| ELIZABETH D. HOLMES,<br><br>                Plaintiff,<br><br>  vs.<br><br>NANCY A. BERRYHILL, Acting Commissioner, Social Security Administration,<br><br>                Defendant. | CIV. 15-5069-JLV<br><br>ORDER |

Plaintiff Elizabeth Holmes filed a complaint appealing the final decision of Nancy A. Berryhill,[1] the Acting Commissioner of the Social Security Administration, finding her not disabled. (Docket 1). Defendant denies plaintiff is entitled to benefits. (Docket 9). The court issued a briefing schedule requiring the parties to file a joint statement of material facts ("JSMF"). (Docket 11). The parties filed their JSMF. (Docket 12). For the reasons stated below, plaintiff's motion to reverse the decision of the Commissioner (Docket 13) is granted.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 20, 2017. Pursuant to Fed. R. Civ. P. 25(d), Ms. Berryhill is automatically substituted for Carolyn W. Colvin as the defendant in all pending social security cases. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**FACTUAL AND PROCEDURAL HISTORY**

The parties' JSMF (Docket 12) is incorporated by reference. Further recitation of salient facts is incorporated in the discussion section of this order. On May 16, 2012, Ms. Holmes filed an application for disability insurance ("DI") benefits under Title II and supplemental social security income ("SSI") benefits under Title XVI, alleging an onset of disability date of March 7, 2012. (Docket 12 ¶ 1). On September 30, 2014, the ALJ issued a decision finding Ms. Holmes was not disabled. Id. ¶ 4; see also Administrative Record at pp. 18-30 (hereinafter "AR at p. ___"). The Appeals Council denied Ms. Holmes' request for review and affirmed the ALJ's decision. (Docket 12 ¶ 4). The ALJ's decision constitutes the final decision of the Commissioner of the Social Security Administration. It is from this decision which Ms. Holmes timely appeals.

The issue before the court is whether the ALJ's decision of September 30, 2014, that Ms. Holmes was not "under a disability, as defined in the Social Security Act, from March 7, 2012, [through September 30, 2014]" is supported by substantial evidence in the record as a whole. (AR at p. 30) (bold omitted); see also Howard v. Massanari, 255 F.3d 577, 580 (8th Cir. 2001) ("By statute, the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.") (internal quotation marks and brackets omitted) (citing 42 U.S.C. § 405(g)).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006); Howard, 255 F.3d at 580. The court reviews the Commissioner's decision to determine if an error of law was committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).

The review of a decision to deny benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005). A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' " Reed,

399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)). Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act.   See Smith, 982 F.2d at 311.

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to DI benefits under Title II or SSI benefits under Title XVI.   20 CFR §§ 404.1520(a) and 416.920(a).[2]   If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled.   Id.   The five-step sequential evaluation process is:

> (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).   The ALJ applied the five-step sequential evaluation required by the Social Security Administration regulations.   (AR at pp. 19-20).

---

[2]The criteria under 20 CFR § 416.920 are the same under 20 CFR § 404.1520.   Boyd v. Sullivan, 960 F.2d 733, 735 (8th Cir. 1992).   All further references will be to the regulations governing DI benefits, unless otherwise specifically indicated.

4

**STEP ONE**

At step one, the ALJ determined Ms. Holmes had not been engaged "in substantial gainful activity since March 7, 2012, the alleged disability onset date." Id. at p. 21 (bold omitted).

Ms. Holmes challenges the ALJ's determination of the onset date of her disability. (Docket 14 at pp. 10-15). She argues the Social Security Administration field office "is charged with responsibility to determine the 'potential onset date' (POD) which may be earlier than the alleged onset date (AOD). . . . The POD establishes the period for which evidence must be developed, so it is foundational." Id. at p. 10 (referencing Program Operations Manual System DI 10505.035) (hereinafter "POMS DI ___").[3] Ms. Holmes argues that just because the field office could not reach her as a homeless, mentally ill person, does not mean that the inquiry stops there. Id. at pp. 10-11. Rather, she argues POMS DI 10505.035 requires the field office to "try to identify a third party that can assist, if possible." Id. at p. 11 (citing Docket 14-1 at p. 6). Ms. Holmes points out when she completed the initial disability application she identified both a third party and an attorney who were available to assist the field office with her claim. Id. (reference Docket 12 ¶ 19). Instead of making contact with either her attorney or the third party to establish a POD, Ms. Holmes submits the field office simply concluded an AOD of March 7, 2012, because that was the end date for her last job. Id. at p. 10.

---

[3]"Although POMS guidelines do not have legal force, and do not bind the Commissioner, this court has instructed that an ALJ should consider the POMS guidelines." Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003) (referencing Berger v. Apfel, 200 F.3d 1157, 1161 (8th Cir. 2000); List v. Apfel, 169 F.3d 1148, 1150 (8th Cir. 1999)).

Ms. Holmes claims that when her file went to the Department of Disability Services Office ("DDS") it "failed to develop a work history to compensate for the field office's curtailed analysis." Id. at p. 11. She argues the "DDS simply noted without questioning, that 'no' period[s] of work were determined to be unsuccessful work attempts." Id. When her work history report got to the administrative hearing level, Ms. Holmes argues the report "should have signaled adjudicators at all levels that her work history required development to identify the POD . . . and also to develop the impairment-related reasons for minimal wages in jobs displayed in the [work report]." Id. at p. 12.

Ms. Holmes asserts her work history report reflects the following:

| Year | Employer | Address | Earning |
|---|---|---|---|
| 2008 | McKee's Pub & Grill | Lake Havasu City, AZ | $2,298.37 |
| 2008 | Anna Van Inc. | Anna, TX | $2,176.24 |
| 2008 | Western Dakota Gaming – Valley Sports Bar | no address shown | $8,090.81 |
| 2008 | Professional Staffing – ABTS, Inc. | Clearwater, FL | $32 |
| 2008 | Baibrook Partnership | Dallas, TX | $291.76 |
| **2008** | **Total** | **Earnings** | **$12,889.18** |
| 2009 | Anna Van Inc. | no address shown | $2,123.51 |
| 2009 | Black Hills Coffee | Rapid City, SD | $2,963.75 |
| 2009 | Fuddruckers | Rapid City, SD | $521.48 |
| 2009 | OS Restaurant Service | Tampa, FL | $388.42[4] |
| 2009 | Great Western Corral | Colorado Springs, CO | $501.43 |
| **2009** | **Total** | **Earnings** | **$6,498.59** |
| 2010 | Salvation Army | Omaha, NE | $70.69 |
| 2010 | International House of Pancakes | Rapid City, SD | $50.31 |
| **2010** | **Total** | **Earnings** | **$121.00** |
| 2011 | Dakotah Steakhouse | Custer, SD | $361.80 |
| **2011** | **Total** | **Earnings** | **$361.80** |

---

[4]Ms. Holmes' brief reports her income as $202.52, but she failed to include tips received of $185.90. Compare Docket 14 at p. 12 and AR at p. 294.

(Docket 14 at p. 12; see also Docket 12 ¶ 15 and AR at pp. 293-95). Ms. Holmes had no work activity after 2011. (Docket 12 ¶ 17). Ms. Holmes argues all of her employment in the years 2009 to 2011 may qualify as "unsuccessful work attempts" or not otherwise amounting to "substantial gainful activity." (Docket 14 at pp. 11-13) (referencing Social Security Ruling ("SSR") 84-25;[5] see also 20 CFR § 404.1574(a)(1)) ("We generally consider work that you are forced to stop to reduce below substantial gainful activity level after a short time because of your impairment to be an unsuccessful work attempt.").

Ms. Holmes contends the ALJ is not allowed to simply adopt an "AOD of March 2012," but rather "was required to apply the criteria of SSR 83-20: 'Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence. These factors are often evaluated together to arrive at the onset date.'" (Docket 14 at pp. 13-14) (citing SSR 83-20[6]).

Ms. Holmes argues "[t]he ALJ's failure to investigate and correctly identify the POD was harmful because the ALJ's adverse credibility assessment was based in part on the undeveloped work history." Id. at p. 14. Ms. Holmes believes the failure of the ALJ to complete a proper work history was also prejudicial because had a POD been established in either 2008 or 2009, the regulations would have required the development of "medical and other evidence

---

[5]Social Security Ruling 84-25, 1984 WL 49799.

[6]Social Security Ruling 83-20, 1983 WL 31249.

associated with that time frame." Id. at p. 15. Finally, Ms. Holmes argues "monetary and medical benefits" were lost because of "an incorrect onset date." Id.

The Commissioner resists Ms. Holmes' challenge to the onset date of disability. (Docket 17 at pp. 4-6). The Commissioner argues the claimant "attempts to muddy her onset date with citations to a thicket of Program Operating Manual ("POMS") citations, but the fact remains that the ALJ considered the onset date Holmes herself provided." Id. at p. 4. The Commissioner asserts Ms. Holmes stopped working on August 1, 2010, not because of a disability, but for other reasons. Id. (referencing Docket 12 ¶ 21). In support of this argument, the Commissioner points out "[Ms.] Holmes produced medical records starting in March 2012 . . . and testified she became disabled in March 2012." Id. at pp. 4-5. The Commissioner claims the medical records support the first notation of depression appears in claimant's medical records on March 5, 2012. Id. at p. 5. In that record, Ms. Holmes was treated for anxiety with no "history of anxiety or depression." Id. (referencing AR at p. 413). The Commissioner also contends the onset date is accurate because Dr. Garry's psychiatric report of July 15, 2014, notes that when he first saw Ms. Holmes in "November 2012, she had not had any previous psychiatric treatment . . . ." Id. (referencing AR at p. 489). The Commissioner argues "the ALJ is not required to further investigate because Holmes did not seek any medical treatment prior to March 2012 and the record did not suggest an earlier onset

date."  Id. at p. 6 (referencing Karlix v. Barnhart, 457 F.3d 742, 747 (8th Cir. 2006)).

In rebuttal, Ms. Holmes argues the Commissioner selectively references Dr. Garry's November 2012 clinical note because she reported a mental health condition which "clearly predated March 2012."  (Docket 18 at p. 2).  Because SSR 83-20 requires the ALJ to look to three factors—claimant's allegations, her work history and the medical evidence—to determine a POD, Ms. Holmes contends the Commissioner cannot overlook the obligation imposed on the agency to gather evidence from all three sources.  Id. at pp. 1-2.  Because of the status of the record, Ms. Holmes argues the ALJ was obligated to consider her unsuccessful work activities, obtain pre-2012 medical records and order a consultative examination.  Id. at p. 2.

The record is complicated by the fact Ms. Holmes had three separate ALJ hearings: January 8, 2014; May 27, 2014; and September 18, 2014.  (Docket 12 ¶ 107).  During the first hearing in Dallas, Texas, on January 8, 2014, ALJ Stanley M. Schwartz asked Ms. Holmes, who appeared *pro se*, what types of problems she was experiencing.  Id. ¶¶ 108 & 113.  Ms. Holmes testified:

> I have anxiety, I have a lot of depression, I have a bipolar disorder, I have breathing problems, I have acute pneumothoraxes.  I've had suicidal thoughts but that's what the bipolar is, that's what they told me.  So I've been taking all my medications like I'm supposed to . . . . I mostly just stay at the house by myself because when I get around people I'll start . . . having issues . . . . I just—my heart rate, rapid heart rate.  I shake, I have a hard time breathing sometimes. I mean, the pills help me sometimes but they, they knock me so far down I'm just like, down.

9

Id. ¶¶ 113-14.   When ALJ Schwartz advised her that the only medical records available to him were her Community Health Center of the Black Hills records for March 5 and March 12, 2012, Ms. Holmes suggested "you should have Behavior Management [records] . . . my psychiatrist over there."   Id. ¶ 116.   Ms. Holmes told ALJ Schwartz her mental health was one of her major problems because "I have panic attacks around people and stuff."   Id. ¶ 118.   She explained that for her last job she "worked three days and I just, I just freaked out.   I just—bad panic attacks."   Id. ¶ 119.   Because of the answers received in these areas and other answers Ms. Holmes provided about her mental status, ALJ Schwartz continued the hearing as he wanted her to complete "psychological and internal medicine examinations" and have "pulmonary functions studies" completed. Id. ¶ 127.   The Texas hearing was canceled because Ms. Holmes returned to South Dakota and the consultative examinations were not performed.   Id. ¶ 128.

The second hearing occurred in South Dakota before ALJ James W. Olson on May 27, 2014, with Ms. Holmes appearing *pro se*.   Id. ¶ 129.   During this hearing, Ms. Holmes testified she last worked "[t]wo, three years ago."   Id. ¶ 132. When asked why she quit working, Ms. Holmes stated: "I couldn't breathe, having panic attacks, anxiety attacks, a lot of, just stress related issues."   Id. ¶ 133.   When prompted by the ALJ and a friend who attended the hearing with her, Ms. Holmes stated she had been seeing Dr. Garry at Behavior Mental Health for psychological treatment.   Id. ¶¶ 136-37.

ALJ Olson engaged Ms. Holmes in a discussion about her activities of daily living.  Id. ¶¶ 138-47.  When ALJ Olson learned Ms. Holmes previously had a hysterectomy and pneumothorax surgery, his response was "I need the records." Id. ¶ 149.  After a lengthy discussion between Ms. Holmes, her friend and ALJ Olson, he announced "if you want to get those medical records to me, you should do that.  I'll give you 30 days to do it."  Id. ¶ 160.  ALJ Olson said he would obtain records from Rapid City Regional, McKinney, Texas, and Behavioral Health, and told Ms. Holmes to obtain whatever other records she thought might be "important."  Id.  Records were obtained by the ALJ from Rapid City Regional Hospital, Behavior Management Systems [Rapid City] and the Medical Center of McKinney, Texas.  Id. ¶ 162.

The third administrative hearing occurred before ALJ Olson on September 18, 2014.  Id. ¶ 163.  Ms. Holmes appeared *pro se* with her friend, Mr. Lindsey. Id.  Robert Pelc, Phy.D., testified.  Id. ¶ 164; see also AR at p. 91.  Dr. Pelc testified he examined administrative record exhibits "1F through 8F."  (Docket 12 ¶ 164).  Those records are summarized as follows:

> Exhibit 1F consists of nine pages, containing three pages of records of the Community Health Center of the Black Hills, Rapid City, South Dakota (March 5 and March 21, 2012) and four pages of laboratory test results from Rapid City Regional Hospital.  (AR at pp. 409-17; see also Docket 12 ¶¶ 37-45);
>
> Exhibit 2F consists of a 2-page report [page 2 is blank] of psychologist Pat McCarley reviewing an unidentified record for "pneumothorax, liver problems, and anxiety."  (AR at pp. 418-19);
>
> Exhibit 3F consists of a 2-page report [page 2 is blank] of family practice specialist Richard Goodge reviewing an unidentified record

11

for "acute pneumothorax, anxiety, and liver failure."  (AR at pp. 420-21);

Exhibit 4F consists of a 13-page psychiatric review technique report of Ronald P. Houston, Ph.D., who "[r]eviewed Exhibits 1F through 3F."  (AR at pp. 422-34);

Exhibit 5F consists of 14 pages of medical records from the Medical Center of McKinney [Texas]—Emergency Department for December 16, 2013, and January 1, 2014.  (AR at pp. 435-48; see also Docket 12 ¶ 65);

Exhibit 6F consists of 40 pages of the Rapid City Regional Hospital Emergency Department for June 30, 2012; March 21, 2013; February 5, 2014 and May 3, 2014.  (AR at pp. 449-88; see also Docket 12 ¶¶ 66-70);

Exhibit 7F consists of 30 pages of Behavior Management Systems records, Dr. Mark Garry, for May 27, 2014; June 26, 2014; July 2, 2014; July 9, 2014; July 15, 2014; and July 17, 2014.  (AR at pp. 489-518; see also Docket 12 ¶¶ 71-99);

Exhibit 8F consists of two pages from the Crisis Care Center of Behavior Management Systems for May 27, 2014.  (AR at pp. 519-20).

Not included in the administrative record at the time of the May 27, 2014, hearing were Dr. Mark Garry's clinic notes and the Behavior Management Systems notes of November 14, 2012, through January 15, 2013.  (Docket 12 ¶ 48; see also ¶¶ 49-62).  These records were submitted to the Appeals Council and were not considered by Dr. Pelc or ALJ Olson.  Id. ¶ 48 n.5.

In his clinic notes of November 14, 2012, Dr. Garry wrote:

Rather dramatically over the last 2 years [Ms. Holmes] has noticed an increase in depression and anxiety.  She has found herself to be more cranky, irritable, blowing up easily.  It has gotten to the point now where she is having panic/anxiety attacks when she goes out in public.  It is almost nearly impossible for her to go out in crowds without getting palpitations and feeling that she is going to fall to the

> ground and die.  Her heart starts racing immediately just thinking about it here, and she started sweating and having to fan herself . . . . She goes out in public for brief periods of time and starts having these attacks and has to go back to her car to catch her breath. Even when she goes to her relative's home or someone comes into her house she can play with the kids for a bit and then has go to retreat to her room because it is so difficult to stay around people.

Id. ¶ 48.  Dr. Garry concluded "[Ms.] Holmes' mood was anxious with congruent affect, but her thought processes were directed and logical and he saw no signs of psychosis. . . . Because she had reported the recent death of both grandparents . . . her anxiety was centered around their death and was also linked to her own history of cancer and sudden lung collapse."  Id. ¶ 56. Dr. Garry diagnosed "Anxiety Disorder NOS" and assessed Ms. Holmes with "a GAF of 50."[7]  Id. ¶ 57.  "He prescribed a trial of Citalopram[8] and Buspar.[9]"  Id.

---

[7]GAF is a numeric rating, on a scale of 0 to 100, used to rate subjectively an individual's "overall level of functioning" by rating symptom severity and social, occupational, or psychological functioning.  See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, "Axis V: Global Assessment of Functioning" at Axis V: Global Assessment of Functioning" at *34 (DSM-IV-TR 2000).  Where the symptom severity and level of functioning are discordant, the GAF rating reflects the worst of the two.  Id.  GAF ratings represent current levels of functioning "because ratings of current functioning will generally reflect the need for treatment or care."  Id.  "A GAF of 41 to 50 indicates the individual has '[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning . . . . [and a] GAF of 51 to 60 indicates the individual has '[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning . . ."  Nowling v. Colvin, 813 F.3d 1110, 1115 n.3 (8th Cir. 2016) (internal citations omitted).

[8]"Celexa, generic Citalopram, is a [selective serotonin reuptake inhibitor] used to treat depression."  (Docket 12 ¶ 199).

[9]"Buspar, generic Buspirone, is used to treat anxiety disorder."  (Docket 12 ¶ 198).

13

On December 20, 2012, Ms. Holmes was seen by Dr. Garry for medication management.  Id. ¶ 58.  During that visit, Dr. Garry noted "her anxiety was better . . . [and] [o]bjectively her appearance and speech were appropriate, thought process logical, perceptions normal and her cognitive function 'acceptable.' "  Id. ¶¶ 58-59.  She was continued on increased dosages of Citalopram [Celexa] and Buspar, with Trazadone[10] for insomnia at night.  Id. ¶ 59.  Dr. Garry assessed her current GAF as 60.  Id.

On January 15, 2013, Ms. Holmes was seen by Certified Nurse Practitioner Rose Lammers at Behavior Management Systems for medication management.  Id. ¶ 60.  Ms. Holmes reported experiencing increased anxiety with the increased dosage of Citalopram.  Id.  She felt the Buspar [Buspirone] was ineffective and quit taking Trazadone for the same reason.  Id.  Ms. Lammers reported Ms. Holmes' "general appearance and speech rate were appropriate, thought process logical, perceptions normal, and cognitive function acceptable. . . . affect was anxious."  Id. ¶ 61.  "Ms. Lammers assessed her current GAF as 50."  Id.  Ms. Holmes was instructed to taper off from Celexa, Buspar and Depakote[11] were prescribed.  Id.  Ms. Lammers recommended a medical follow-up for Ms. Holmes' history of seizures and left arm disability, which was related to her pneumothorax treatment.  Id. ¶ 62.

---

[10]"Trazodone, generic Desyrel, is a serotonin modulator used to treat depression and sometimes used to treat insomnia and schizophrenia."  (Docket 12 ¶ 203).

[11]"D[e]pakote, generic Valproic acid, is an anticonvulsant that is also used to treat mania in people with bipolar disorder."  (Docket 12 ¶ 200).

It is unclear from the administrative record why the 2012 to 2013 records of Dr. Garry and Behavior Management Systems were not obtained early on in the records gathering process.  While the court makes no determination at this juncture as to the impact these records have on Ms. Holmes' disability determination, it is clear that if they had been timely obtained, these records would boot-strap into an evaluation of Ms. Holmes' historical work report.

"Unsuccessful work attempt" is defined as:

> [W]ork [which] must have ended or have been reduced to the non-SGA level within   3 months due to the impairment or to the removal of special conditions related to the impairment that are essential to the further performance of work . . . . [or] [i]f work lasted more than 3 months, it must have ended or have been reduced to non-SGA level within       6 months due to the impairment or to the removal of special conditions . . . related to the impairment that are essential to the further performance of work and:
>
> a.   There must have been frequent absences due to the impairment; or
>
> b.   The work must have been unsatisfactory due to the impairment; or
>
> c.   The work must have been done during a period of temporary remission of the impairment; or
>
> d.   The work must have been done under special conditions.

(SSR 84-25).   To determine whether a job was an unsuccessful work activity, information from the claimant and the employer is necessary.  Id.   Questions posed generally include the following:

   a.   When and why was the SGA-level work interrupted, reduced or stopped?

15

    b.    If special working conditions (as described in the preceding section) were removed, what were those conditions or concessions?  When, how and why were they changed?

    c.    Were there frequent absences from work?  Were days and hours of work irregular and, if so, why?

    d.    Was job performance unsatisfactory because of the impairment?

    e.    Did the employer reduce the person's duties, responsibilities or earnings because of the impairment?

    f.    When the employee's work effort ended, was the continuity of employment broken?  Did the employer grant sick leave or hold the position open for the person's return?

    g.    In the case of a self-employed person, what has happened to the business since the discontinuance or reduction of work?  If the business continued in operation, who managed and worked in it and what income will the disabled person derive from it?

Id.

Ms. Holmes citation to SSR 83-20 was incomplete.  The paragraph regarding factors to be considered in establishing the onset date of disability states:

> Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence.  These factors are often evaluated together to arrive at the onset date.  <u>However, the individual's allegation or the date of work stoppage is significant in determining onset only if it is consistent with the severity of the condition(s) shown by the medical evidence</u>.

(SSR 83-20, 1983 WL 31249 at *1) (emphasis added).  SSR 83-20 considers the last day of employment critical in establishing an onset date of disability.  "The

16

day the impairment caused the individual to stop work is frequently of great significance in selecting the proper onset date. The district office . . . has the responsibility for documenting the claim (via Form SSA-821-F4 (Work Activity Report -- Employee) . . . concerning pertinent work activity by the claimant before or after the alleged onset date." Id. The regulation reminds the district office of the relevancy of the claimant's statement of the alleged date of disability onset. "In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available. When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy. However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record." Id. If the file is incomplete or relevant medical information is unavailable, the district office is directed to continue the search. "Information may be obtained from <u>family members, friends, and former employers</u> to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition." Id. (emphasis added).

The working relationship between the state agency and the Commissioner is clearly established. "The State agency will secure from the claimant, or other sources, any evidence it needs to make a disability determination." 20 CFR § 404.1614(a). At the request of the SSA "the State agency will obtain and furnish medical or other evidence and provide assistance as may be necessary

for [SSA] to carry out our responsibilities . . . ." Id. at § 404.1614(c). "The State agency will furnish [SSA] with all the evidence it considered in making its determination." Id. at § 404.1615(f). While the ALJ is not responsible for the development of these types of records, in their absence the ALJ is obligated to ask the state agency to provide these types of documents for the record. Snead, 360 F.3d at 838; Clark, 28 F.3d at 830-31; Shontos, 328 F.3d at 424; 20 CFR §§ 404.1614(a) & (c).

While Ms. Holmes' declaration of her onset of disability date is relevant, the ALJ erred by not acquiring all of her medical records from the 2012 to 2013 period and then examining her work history report in light of that evidence. "In determining the date of onset of a disability, the ALJ should consider the claimant's alleged date of onset, [her] work history, and the medical and other evidence of [her] condition." Karlix v. Barnhart, 457 F.3d 742, 747 (8th Cir. 2006) (referencing SSR 83-20; other citation omitted). In Karlix, "the record [was] void of any other evidence suggesting an earlier date of onset." Id. Karlix is distinguishable from Ms. Holmes' case because her administrative record demands a further inquiry to determine whether an earlier date of onset of disability exists. (SSR 83-20 and 84-25).

The Commissioner's argument that the POMS need not be considered is disingenuous. In light of the status of the records available to the ALJ in Ms. Holmes' case, the ALJ should "consider the POMS guidelines." Shontos, 328 F.3d at 424.

Total wages of $121 in 2010 and $362 in 2011, coupled with the fact that Ms. Holmes had no reported work activities for 2012 through 2014, should have been a signal to the ALJ to make further inquiry of Ms. Holmes and her past employers about the reasons for termination of work activities.  (SSR 83-20 and 84-25).  Without further inquiry, neither of Ms. Holmes' 2010 or 2011 work activities constitute substantial gainful activities.  See SSR 83-33[12] (earnings of less than $300 are presumed to not be substantial gainful activity).

The court notes that the Social Security Administration concluded "that GAF scores have limited importance."  Nowling, 813 F.3d at 1115 n.3 (referencing Jones v. Astrue, 619 F.3d 963, 973-74 (8th Cir. 2010) ("[T]he Commissioner has declined to endorse the [GAF] score for use in the Social Security and [Supplemental Security Income] disability programs and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings.") (internal citations omitted). Notwithstanding this caveat, Ms. Holmes' GAF scores of 50 on more than one occasion should have been considered by the Commissioner to determine what impact, if any, her mental status had on her work history.

The ALJ erred at step one by failing to complete the analysis to determine Ms. Holmes' potential onset of disability date and ultimately an actual onset of disability date.  42 U.S.C. § 405(g); Choate, 457 F.3d at 869; Howard, 255 F.3d at 580.  This constitutes reversible error.  The remainder of the ALJ's decision

---

[12]SSR 83-33, 1983 WL 31255.

19

is similarly defective.  Once the onset of disability date is accurately established, the subsequent steps in the evaluation process must be reanalyzed.  The court has no confidence in the remainder of the ALJ's decision.  Snead, 360 F.3d at 839.  The evidence not appropriately considered by the ALJ detracts from the decision to deny disability benefits.  Reed, 399 F.3d at 920.

## ORDER

Based on the foregoing analysis, the court finds the matter should be remanded for further proceedings consistent with this order.  Accordingly, it is

ORDERED that plaintiff's motion to reverse the decision of the Commissioner (Docket 13) is granted.

Dated March 27, 2017.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE